IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MAPLE TRADE FINANCE, INC.,

　　　　Plaintiff,


vs.


LANSING TRADE GROUP, LLC,

　　　　Defendant/Third-Party Plaintiff,

　　　　　　　　　　　　　　　　Case No. 10-2066-JTM

vs.


GREENFIELD PRODUCTS CANADA, INC,
GLENN M. VANDERLINDEN, and
BONNIE VANDERLINDEN
　　　　　　Third-Party Defendants.


MEMORANDUM AND ORDER


This matter involves a claim by an assignee of accounts receivable of third-party defendant

Greenfield Products. Greenfield and defendant Lansing Trade Group entered into contracts for the

sale of biofuel products. Greenfield assigned its receivables under the contracts to the plaintiff

Maple Trade Finance, Inc. (MTF). Greenfield failed to deliver the required products, and the matter

is now before the court on cross-motions for summary judgment by plaintiff and defendant seeking

to allocate the loss between the parties.[1]

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

---

[1]In addition, Lansing has moved for a default judgment against third-party defendants
Greenfield and the Vanderlindens. The third-party defendants have filed no response, and the
plaintiff has not opposed the motion. For good cause shown, Lansing's motion for default
judgment is hereby granted.

material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The findings of fact here do not include denials which are either unaccompanied by any reference to evidence, or accompanied by only the most general, non-particularized reference to evidentiary materials. See D.Kan.R. 56.1.

*Findings of Fact*

2

On May 15, 2007, MTF and Greenfield entered into a credit agreement and an assignment of receivables agreement. Under terms of these agreements, collectively known as the Lending Documents, MTF could finance some of Greenfield's receivables and Greenfield would assign those receivables to MTF to secure the loans.

Pursuant to the Lending Documents, MTF financed Invoices 87031, 87030, 87034, 87036 and 87037, and Greenfield assigned those Invoices to MTF. Lansing was listed as the "customer" and "buyer" on each of these invoices.

On September 7, 2007, Greenfield and Lansing executed a Notice and Direction to Pay, under which Greenfield "authorize(d) and direct(ed)" Lansing "to pay all monies which are now payable or may become payable to us under all invoices/contracts that we so designate to MTF." (Miller Dec. Exh. D-2). Lansing correctly notes that the Lending Documents do not explicitly identify any individual invoices, but it is uncontroverted that Invoices 87031, 87036 and 87037 explicitly state that they have been assigned to MTF.

Lansing signed each of the invoices. Each invoice contained the following language:

ATTENTION: Ths invoice has been assigned to Maple Trade Finance Inc. and we acknowledge receipt of goods and agree to make payment directly to MTF at the address below or wire transfer to: [address and wire transfer information omitted].

On September 7, 2007, MTF received by fax the first request for invoice financing of a Lansing invoice. It included the Notice and Direction to Pay signed by both Lansing and Greenfield, Invoice 87031 signed by both Lansing and Greenfield with Lansing's acknowledgment of receipt of the goods, and a Bill of Lading relating to the same goods signed by both Lansing and Greenfield.

On September 10, 2007, MTF received by fax an addition to Schedule A of the Assignment Agreement by which Invoice 87031 was assigned to MTF.

On September 10, 2007, MTF representative Anju Gupta contacted Douglas Downing of Lansing by telephone and confirmed (i) receipt of the goods shown on Invoice 87031 from Greenfield, (ii) that he understood MTF's payment procedures and (iii) that Lansing would make payment directly to MTF.

On September 11, 2007, MTF received by fax another request for invoice financing of a Lansing invoice. It included Invoice 87030 signed by both Lansing and Greenfield with Lansing's acknowledgment of receipt of the goods, a Bill of Lading relating to the same goods, and an addition to Schedule A of the Assignment Agreement by which Invoice 87030 was assigned to MTF.

On September 13, 2007, MTF received by fax another request for invoice financing of a Lansing invoice. It included Invoice 87034 signed by both Lansing and Greenfield with Lansing's acknowledgment of receipt of the goods, and a Bill of Lading relating to the same goods. On September 14, 2007, MTF received by fax an addition to Schedule A of the Assignment Agreement by which Invoice 87034 was assigned to MTF.

On September 14, 2007, MTF received by fax another request for invoice financing of a Lansing invoice. It included Invoice 87036 signed by both Lansing and Greenfield with Lansing's acknowledgment of receipt of goods, a Bill of Lading relating to the same goods signed by both Lansing and Greenfield, and an addition to Schedule A of the Assignment Agreement by which Invoice 87036 was assigned to MTF.

On September 17, 2007, MTF received by fax another request for invoice financing of a Lansing invoice. It included Invoice 87037 signed by both Lansing and Greenfield with Lansing's acknowledgment of receipt of goods, and a Bill of Lading relating to the same goods signed by both Lansing and Greenfield. On September 18, 2007, MTF received by fax an addition to Schedule A of the Assignment Agreement by which Invoice 87037 was assigned to MTF.

In reliance upon Lansing's acknowledgments that it received the goods stated on the Invoices and that Lansing agreed to make payment on the Invoices directly to MTF, MTF loaned Greenfield the following amounts:

| Amount ($) | Date | Invoice |
|---|---|---|
| $80,067.18 | September 10, 2007 | 87031 |
| $16,256.25 | September 11,2007 | 87030 |
| $30,600.00 | September 14, 2007 | 87034 |
| $322,385.28 | September 14, 2007 | 87036 |
| $378,723.45 | September 18, 2007 | 87037. |

In its Response, Lansing correctly notes that MTF has also indicated that its actions were prompted by both Lansing's statements in the invoices, and by its agreements and history with Greenfield, but the uncontroverted fact presented by MTF does not allege that Lansing's representations were the sole reason for its loan decisions, only that they were an essential part of it. It is uncontroverted that MTF would not have loaned any amounts to Greenfield against these Invoices without these acknowledgments by Lansing.

MTF has received payment in full from Lansing on Invoices 87030 and 87034. After retaining the amounts loaned against these Invoices and the interest earned, MTF paid the remaining amount to Greenfield.

MTF has not received any payment from Greenfield on the amounts loaned against Invoices 87031, 87036, and 87037, and Greenfield is in default on those loans.

Lansing has not paid Invoices 87031, 87036 and 87037, asserting that Greenfield did not deliver the goods stated on these invoices.

At the time these loans were made, MTF had no knowledge inconsistent with Lansing's acknowledgments on the invoices that it had received the goods.

Doug Downing of Lansing asserted in an affidavit filed in the Canadian Action that he acknowledged receipt of goods based on Greenfield's principal, Glenn Vanderlinden's, statement that the Greenfield had delivered the goods to Memphis Biofuels for conversion into biodiesel for sale and future delivery by Greenfield to Lansing, and that he had no independent verification of the delivery of the goods by Greenfield to Memphis. In the same affidavit, Downing asserted he later learned Greenfield did not deliver the goods stated on the Invoices.

In July 2008, MTF sued Lansing by filing a Statement of Claim against Greenfield and Lansing in the Supreme Court of Nova Scotia. In June 2009, MTF obtained a default judgment in the amount of $1,132,754.74 against Greenfield in the Canadian action.

Two months later, Lansing filed a motion challenging the court's jurisdiction. MTF subsequently moved to dismiss its claim, filing a "Notice of Discontinuance."

During an October 15, 2009, Case Management Conference in New York in the U.S. District Court for the Southern District of New York, Lansing's counsel sought clarification of the claim asserted in MTF's Complaint, stating "it's unclear to me from the complaint whether this is a tort claim or a contract claim or both." (Def. Resp. Exh. 5).

Lansing stresses that MTF emphasized the contractual nature of the action, as basically "a breach of contract case." (Def. Exh. 5). However, the actual colloquy indicates that MTF did allege the existence of some degree of misrepresentation, but simply did not advance any separate tort claim at that time:

THE COURT:     Well, we might, but before we get to that, I'm just--let me just look at your complaint again.

So what aspect of your complaint sounds in anything other than contract?

MR. CAHN:     Well, again, I don't think that it does; but the problem here – and this is a fact pattern, I have to say, I haven't seen before in my practice. Basically, the plaintiff, who's a finance company, advanced funds to its borrower, who was the other defendant in the Canadian action that Mr. May mentioned – they're not a defendant here – and as security took their right to receive payment on invoices that were being generated by its borrower to Mr. May's client, the defendant herein. It's a fairly standard practice. And before taking the assignment of the receivables, inquiry was made to Lansing, the defendant here, as to whether or not they had received the goods that were the subject of the invoices that we were taking the security interest in. We were told that they had received them and that there was no problem with them. Subsequently – and on that basis, we advanced the funds.

Subsequently, representatives of Lansing denied that they had ever received the goods. So –

THE COURT:     So there's also a possible misrepresentation?

MR. CAHN:     There's a possible misrepresentation. We don't believe that that impacts our case, but I can understand, you know, why Mr. May might say what he just said.

|  |  |
|---|---|
| | And, in addition to that, you know, in the answer, you know, there is the suggestion that there was some sort of fraud or impropriety committed not by us – or at least there's no allegation against us – but something committed by a borrower who's not yet a party to this case. I assume that that is the third party that Mr. May is considering adding to this case. |
| | So it's a little bit off the beaten track. From my point of view, this is a breach of contract case. |
| THE COURT: | Okay. So there you have plaintiff's answer. You know, the – he has and you have until November 13 to file amended pleadings without leave of Court. If something turns up on discovery that leads any party to believe that they should further amend their pleadings, they can so apply, but then that can be opposed; and, you know, it depends what happens. My usual practice is, for example, not to allow a whole new claim to be added two weeks before trial or something like that. But, on the other hand, in the middle of discovery I often do allow additional claims to be added. |
| | So but right now he's saying he's got just a contract claim. He's said that here in open court. I don't know what more you need. |
| MR. MAY: | Yes. The only thing that concerns me, your Honor, is I have to add parties. If it's tort based, I'm more likely to add a party. In paragraph 12 of their complaint it refers to representations and reliance by the plaintiff, and that sounds like a tort to me. |
| THE COURT: | Well, I--he certainly has said here in open court that there is an allegation of misrepresentation, but he hasn't claimed that. |
| MR. MAY: | Okay. |
| THE COURT: | That's--you know, so there we are. Certainly, if he changes his mind, I encourage him, for his own sake as well as your sake, to do that sooner rather than later so that you won't be prejudiced, because if you are prejudiced, then he may not be allowed to change his mind.... |

In its Opposition to Lansing's Motion to Transfer, MTF described its claim as a "simple contract action." Case No. 09 Civ. 7457 (JSR) (S.D.N.Y.) (Dkt. 16). But it also stated that "Lansing acknowledged receipt of the goods related to the Invoices and agreed to make payment directly to MTF." *Id*. at 2.

On November 25, 2009, the Court granted Lansing's motion to transfer, following this decision with an Order on January 4, 2010, stating the reasons for the transfer.

On April 20, 2010, the parties submitted to this Court a Report of Parties' Planning Conference in which MTF stated that "[t]his is a breach of contract case for payment of accounts receivable assigned to plaintiff." Indeed, the Report further states that the principle of comparative fault was not applicable to the case "because Plaintiff asserts only a breach of contract claim." *Id.* at 8. In its description of the "legal theory" of its "breach of contract" claim, MTF never mentions any "representation," "reliance," or "equitable estoppel." However, the Report does state, in connection with plaintiff's breach of contract theory, that "[b] Before loaning the money to Greenfield, plaintiff obtained defendant's written acknowledgment that the goods stated on three invoices had been received and that defendant agreed to make payment of the invoices directly to plaintiff." *Id.* at 4.

According to Lansing's Doug Downing, Greenfield revoked any assignment of Invoice 87031 and any amounts due on that Invoice, and Lansing paid the amount due on the Invoice to Greenfield. Lansing also cites the affidavit of Downing for the propositions that "[u]nder the agreement between Lansing and Greenfield, Lansing had no obligation to pay Greenfield until biodiesel was ready for loading onto railcars," Lansing only agreed to buy B100 biodiesel, and Lansing had "no agreement to purchase feedstock from Greenfield." (Dkt. 69, at ¶13).

MTF responds that these are conclusions of law rather than statements of fact. Further, it contends that the assignment agreement could not be repudiated at will by Greenfield, as the Notice and Direction to Pay agreement provided that the "direction (was) irrevocable except with the consent of Maple Trade Finance Inc," and that it never revoked the assignment of invoice 87031.

According to Lansing, it learned that Greenfield had a financing agreement with MTF from discussions with Greenfield's principal, and Downing, on behalf of Lansing, signed a Notice and Direction to Pay document and certain Invoices subject to the terms of the Lansing-Greenfield contract.

Lansing's contract with Greenfield provides that it will make payment and make no deduction, offset, or counterclaim upon the occurrence of a series of events, none of which occurred.

8

In response to an Interrogatory asking "Do you contend that 'the goods had been delivered in accordance with [Greenfield's] contracts of sale with Defendant' Lansing, as alleged in Paragraph 12 of the Complaint," MTF answered "MTF does not presently contend that the goods delivered in Invoices 87036 and 87037 were delivered in accordance with the contract of sale.... MTF's claim is based upon an estoppel arising from Lansing's written acknowledgments that the goods had been received and its agreement to make payment directly to MTF." (Def. Exh. 11). With respect to Invoice 87031, MTF answered that it "contends the goods described in Invoice 87031 had effectively been delivered as it apparently reflected a credit due to Greenfield from Lansing upon a prior transaction." *Id.*

In response to an Interrogatory asking MTF to "Identify each contract or agreement that Maple Trade alleges Lansing has breached," MTF answered that "the Invoices reflect contracts between Greenfield and Lansing for sale of the goods noted on the Invoices. Greenfield assigned the Invoices to MTF." *Id.*

In response to an Interrogatory asking MTF to "Identify each of the 'contracts of sale with Defendant' to which Paragraph 12 of the Complaint refers," MTF answered that

> As to Invoice 87031, MTF understands that Greenfield was due a credit from Lansing arising from a previous contract of sale referred to in their correspondence as "the IREC deal." See LTG_000026-000030. As to Invoices 87036 and 87037, MTF understands that Lansing and Greenfield entered into a contract for the sale of approximately 1,800,000 gallons of biodiesel fuel on or about Sept. 11, 2007, and that either as a part of that contract, or as an amendment to that contract, or as a separate contract Lansing and Greenfield agreed that Lansing would purchase and pay for some of the materials used to make the biodiesel (feedstock) and Lansing's payments would be credited as partial payments for the finished biodiesel. See Doug Downing's affidavit of June 3, 2009. It was in regard to this feedstock itemized on Invoices 87036 and 87037 that Lansing made written acknowledgment of receipt of the goods and agreement to make payment directly to MTF.

*Id.* at 7-8.

In response to an Interrogatory asking MTF to identify and describe the representations by Greenfield which MTF alleged it "relied on" in paragraph 12 of its Complaint and in response to an email from counsel for Lansing asking MTF to clarify and substantiate MTF's answer, counsel for MTF stated that "By submitting these documents to MTF and requesting financing of these invoices,

Greenfield effectively represented to MTF that the documents state correct information, including Lansing's written acknowledgments that the goods had been received." *Id*. at 6-7.

Greenfield failed to perform under its contract with Lansing because it never acquired any feedstock to make biodiesel for Lansing and it never actually delivered any biodiesel to Lansing.

Due to Greenfield's failure to perform under its contract with Lansing and due to Greenfield's fraud, Lansing has suffered lost profits of $270,000 on its contract to re-sell the biodiesel it was to purchase from Greenfield, and incurred $121,460 in railcar time and storage costs, as well as incurring costs in defending this action.

Lansing argues that MTF advanced funds to Greenfield on invoices without knowing the difference between feedstock and biodiesel, citing the admission of its corporative representative during her deposition, testifying that she does not think anyone at MTF would have known that biodiesel feedstock was not biodiesel fuel. MTF understood Greenfield to be in the business of producing and/or selling biofuel, it did not at the time funds were advanced understand the difference between biofuel and feedstock, which is essentially an ingredient used to produce the finished product of biofuel.

MTF agrees that its representative so testified, but argues that its "records establish that it did know that biodiesel feedstock was ingredients to be converted into finished biodiesel" In support of this contention, the plaintiff cites Miller's second affidavit, completed after the deposition and apparently in response to her admissions there. But the affidavit merely states that Exhibits J and K are "true, correct and complete cop[ies]" documents found in MTF's files. The first is an eight-page Credit Report, and a string of four emails between persons who are apparently mid-level MTF personnel which tangentially discuss the biofuel industry. Typical of MTF's Reply, it makes no attempt to cite with particularity any particular passage from these multi-page exhibits which would support ignoring the admissions of its party representative. Her testimony was unqualified:

> Q.    From reading all of these credit submissions and the stuff you previewed, you don't know the difference between feedstock and biodiesel fuel?
>
> A.    I didn't.

Q.    Did you know at the time that you gave this credit?

Q.    Did anyone at Maple Trade know Greenfield's business well enough prior to credit being approved to know the difference between feedstock and biodiesel fuel?

A.    It says biodiesel on the invoice.

Q.    It says "biodiesel feedstock - poultry."

A.    No, I don't think anyone at Maple would have known that that is not biodiesel.

Q.    Okay. That would have been true before the decision to extend any credit to Greenfield was made, right?

A.    Correct.

(Miller dep. at 152). Nor does MTF make any attempt to explain the contradiction between this submission and Miller's direct and unqualified statements.

Fraud is "the biggest concern" in MTF's industry, and the placement of insurance covering invoices is a driver that affected whether MTF would advance funds to Greenfield.

It is undisputed that MTF called and spoke to Doug Downing about invoice 87031. It is also undisputed that MTF failed to call Lansing to discuss any other invoice until after the invoices became delinquent.

MTF elected to call Lansing on only invoice 87031 because it regarded the risk of a commercial dispute between Lansing and Greenfield as low. If MTF had evaluated the risk of such a commercial dispute to be higher, it would have called Lansing on each invoice before any funding was made.

MTF recognized that it faced a risk of a commercial dispute between Lansing and Greenfield. Such a commercial dispute could involve the quality of product as well as non-delivery of product.

MTF would want to know about any agreement between Lansing and Greenfield to assess the potential for a commercial dispute between Lansing and Greenfield. It would have been MTF's

practice to ask for any contract between Lansing and Greenfield to determine the potential for a commercial dispute between Lansing and Greenfield.

However, MTF did not have the Lansing/Greenfield contract before advancing funds, and MTF never discussed with anyone at Lansing what Lansing's agreement was with Greenfield. In making advances to Greenfield on invoices involving Lansing, MTF relied on Greenfield's representation that the goods on the invoices had been delivered.

In advancing the funds related to Invoices 87031, 87036, and 87037, MTF relied in substantial part on Greenfield's representations that the goods had been delivered in accordance with Greenfield's contract with Lansing.

Lansing argues that Greenfield was the only party to make any representations to MTF about the Invoices. There is evidence, however, that invoices 87031, 87036 87037 were signed by some person, ostensibly on the part of Lansing. MTF also cites a call from Anju Gupta of MTF to Downing regarding Invoice 87031, the first of the invoices to Lansing, in which Downing stated that he was clear on the procedure and he confirmed that Lansing would make payment directly to MTF.

It is uncontroverted that MTF knew from Greenfield's credit application and prior transactions that Greenfield sold biofuels, not biofuels ingredients such as those listed on the Invoices. Stringing together a series of hypotheticals, MTF argues that the cited documents are not necessarily "inconsistent with the possibility that Greenfield might sell some biodiesel feedstock." (Dkt. 79, at 14).

MTF's representative does not know whether MTF ever discussed with Greenfield the nature of Greenfield's transaction with Lansing before approving the request to have Lansing approved as a buyer, although it would have been MTF's common practice to have done so.

MTF's common practice is to obtain every document associated with a submitted transaction, but it failed to adhere to this policy as to Greenfield's dealings with Lansing as MTF did not obtain a copy of Lansing and Greenfield's contract for the sale of biodiesel, as that contract does not appear in the Greenfield credit file. Nor did it obtain copies of any Purchase Orders between Greenfield and

Lansing, despite an internal MTF document that indicates a Purchase Order might have existed and should have been obtained.

In fact, when Greenfield later attempted to submit another invoice for financing in October 2007, a different MTF employee, who had not worked on prior invoices submitted by Greenfield, demanded to see a purchase order, contract or agreement concerning the Invoice, and MTF did not ultimately finance that invoice. MTF was told that there was no purchase order and that Greenfield had a verbal agreement with Lansing.

MTF understood Greenfield's dealings with Lansing to be identical to Greenfield's dealings with an earlier buyer of biodiesel, but MTF funded the Greenfield's Invoices without requiring key confirmation documents (such as a scale ticket) that had been submitted as part of earlier Greenfield transactions, in particular confirmations of delivery from a so-called "tolling producer" with whom Greenfield would contract to have biodiesel produced before its sale to a buyer like Lansing.

In financing the Invoices, MTF relied not only on Greenfield's representations and the acknowledgment from Lansing that Greenfield provided to MTF, but MTF also relied on the fact that it had insurance in place in loaning money to Greenfield and relied on its past dealings with Greenfield.

MTF experienced a commercial dispute with respect to another Greenfield invoice it financed in connection with a transaction involving Greenfield and Optimira Energy. In the Miller email, produced by MTF to Lansing on October 29, 2010, Miller represented to an insurer (EDC) that MTF's "standard process" for financing invoices involves "written confirmation from the buyer that the goods had been received, inspected and conformed to their requirements" and "verbal confirmation from the buyer that the goods had been received, inspected and met the requirements of the buyer." (Def. Exh. 14). It is undisputed that in the present case MTF received no verbal confirmation that the goods had been inspected and met Lansing's requirements.

In its Reply, MTF argues that the e-mail in question relates to another specific transaction, not the matter involving Lansing. This is inaccurate. The e-mail does reference other claims against

the insurer, but its description of MTF's "standard process" contained a bullet point list which was "followed to the letter," in the case of the separate claim. The whole point of Lansing's uncontroverted fact is that MTF had "standard process" it followed in other cases, but failed to use in the Greenfield transaction.

When MTF served its Rule 26 Initial Disclosures on October 26, 2009, MTF identified six individuals as persons likely to have discoverable knowledge to support its claims and described each as "[k]knowledgeable about accounts receivable due and owing by Defendant Lansing Trade Group LLC." (Def. Exh. 15). MTF did not identify the following as subjects among the discoverable information that it would use to support its claims: any representation by Lansing, any reliance by MTF, any knowledge Lansing had or should have had regarding Greenfield's representation, any knowledge MTF had by virtue of due diligence into Greenfield. MTF also did not identify Anju Gupta as an individual likely to have discoverable information; MTF identified her for the first time by attaching her declaration in support of its motion for summary judgment.

Doug Downing testified as Lansing's corporate representative that the agreement between Lansing and Greenfield consisted of the "contract where I [Lansing] buy the finished biodiesel" and a "tolling or prepay" agreement set forth in "a combination of discussions, emails, and contracts" by which "Glenn [Vanderlinden of Greenfield] and I agreed that to get the final – or the finished biodiesel done that we would instead of paying for the full amount 21 days after it was delivered to me in Memphis, that I would pay for the feedstock portion as soon as he delivered the finished biodiesel to me in Memphis, which was earlier than what we agreed to in the formal biodiesel contract." (Dep at 125).

Downing also testified that "the terms of the contract for the finished biodiesel said that [Lansing] was going to pay [Greenfield] ... $3.148 cents a gallon 21 days after the delivery of the finished biodiesel in Memphis," and that "[t]he revisions that we agreed to make were that . . . [Lansing] would pay . . . earlier once the finished biodiesel was available in Memphis, that [Lansing] would prepay for the feedstock portion of the $3.14 per gallon," (*Id*. at 92-23).

In its Response, MTF argues that the controlling provision is that contained in the Invoices, which call for payment within 21 days of the date of Invoice. However, this denial is unaccompanied by any citation to evidence in the record.

It is uncontroverted that the contract between Lansing and Greenfield for the purchase of 1.8 million gallons of biodiesel was negotiated in part at a meeting in Houston between Doug Downing and Chuck Lapke of Lansing, Glenn Vanderlinden of Greenfield, Jason Gehrig of Renascent, and Ken Arnold of Memphis Biodiesel. They discussed a business arrangement by which Greenfield would obtain feedstock and have it delivered to Memphis Biodiesel for manufacture into biodiesel. Prior to that meeting, Doug Downing had heard of Memphis Biodiesel and had seen Ken Arnold at an industry conference, but had never done any business with Memphis Biodiesel. This meeting took place in late August or early September, 2007, within two or three weeks before Downing signed Invoices 87036 and 87037 acknowledging receipt of the feedstock.

From these facts, MTF concludes that Downing knew who to contact at Memphis Biodiesel to confirm delivery of the feedstock, but there is no direct evidence that Downing knew who to contact at Memphis Biofuel to confirm delivery.

Downing states by affidavit that Invoice 87031 represents a credit due to Greenfield from Lansing on a transaction between them known as the IREC transaction. The IREC transaction was a transaction separate from Lansing's contract with Greenfield to purchase 1.8 million gallons of biodiesel, and with the exception of this remaining credit, the IREC transaction was completed prior to the date of Invoice 87031, September 7, 2007.

Lansing agrees that the IREC transaction was separate, but notes that the IREC invoice was referenced in the Lansing-Greenfield biodiesel purchase agreement, and contends that it thus became a part of that agreement.

Lansing's contract with Greenfield to purchase 1.8 million gallons of biodiesel is dated September 11, 2007, and the contract provided for delivery of the biodiesel through November 10, 2007.

At the time that Doug Downing signed the acknowledgments of receipt of goods on the Invoices, he was aware that MTF was providing financing to Vanderlinden of Greenfield.

**Conclusions of Law**

In its motion for summary judgment, MTF argues that it is the assignee of Greenfield's rights under the contract between Lansing and Greenfield, and that — even though Greenfield never actually delivered the goods to a third party, as called for by that contract — Lansing is estopped from contending otherwise by its actions in signing the invoices to reflect delivery. It argues that Lansing's accepting Greenfield's word that the goods had been delivered, without conducting any additional investigation, even knowing that MTF was relying on such acknowledgment by the Lansing, supplies the elements of estoppel under Kansas law. *See, e.g., Star Leasing Corp. v. Elliott*, 194 Kan. 206, 398 P.2d 566 (l965). Accordingly, it argues that it is entitled to recovery on the three invoices (numbers 87031, 87036, and 87037), along with statutory interest from the time they were due.

In its Response to MTF's motion, and it its separate motion for summary judgment, Lansing asserts that MTF cannot recover on its equitable estoppel claim for four reasons. First, it argues that MTF has essentially abandoned the argument, and that it is too late to raise the issue now. Second, it argues that whether or not estoppel might otherwise exist, MTF as an assignee can only take the rights of its assignor, and thus is subject to the same defenses of fraud or non-delivery that Lansing might assert against the assignor Greenfield. Third, it argues that the elements of estoppel are not present in this case. And fourth, it contends that the existence of fact disputes prevent any award of estoppel at the present time.

The court finds that MTF may advance the claim of estoppel here, and that it is not somehow barred from presenting the defense.

Lansing argues that the estoppel argument is new. In particular, it cites to a colloquy with the court while the action was pending in New York, and counsel's observation that there was "a

possible misrepresentation" in the case, but that "[w]e don't believe that that impacts our case." Further, in the initial pleadings in the case after it was transferred to Kansas, MTF's pleadings do not explicitly use the term "estoppel." Citing *Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 538 F3d 1299, 1303-04 (10th Cir. 2008), Lansing stresses that rule that a court "does not abuse its discretion in refusing to consider a theory raised for the first time at an advanced stage of litigation." Interestingly, Lansing is suggesting MTF should be estopped from presenting its estoppel argument.

However, the passage in the New York colloquy cited by Lansing appeared in the context of discussing whether MTF might advance a separate tort claim in addition to its contract claim. Further, there is no evidence that MTF was foreswearing any future reference to the alleged misrepresentation, as the only action by the court was the judge's observation that he understood the plaintiff to only have a contract claim "right now," coupled with a caution that "[m]y usual practice is, for example, not to allow a whole new claim to be added two weeks before trial or something like that." The judge specifically noted that he "often" allowed the addition of new claims which found support during discovery.

Similarly, while other pleadings cited by Lansing may not mention "estoppel" as a separate element or theory, they also do state that Lansing signed invoices showing delivery of the goods [a representation], and that these signed invoices caused them to issue credit to Greenfield [reliance]. Thus, the plaintiff has effectively raised claims of estoppel. Further, the plaintiff's estoppel argument was explicitly raised prior to the conclusion of discovery. *Elephant Butte* is inapplicable here. In that case, the Tenth Circuit found no abuse of discretion for the district court to hold that the defendants had waived a defense where "they failed to explicitly raise their ... theory until their motion for reconsideration of the district court's *second* summary judgment ruling." 538 F.3d at 1303-04 (emphasis in original). MTF's estoppel theory here is timely advanced, and Lansing has had a full and fair opportunity to present evidence and argument in opposition to it.

> Equitable estoppel is the effect of the voluntary conduct of a party whereby it is
> precluded, both at law and in equity, from asserting rights against another person

relying on such conduct. A party seeking to invoke equitable estoppel must show that the acts, representations, admissions, or silence of another party (when it had a duty to speak) induced the first party to believe certain facts existed. There must also be a showing the first party rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts. There can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved. Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. A party may not properly base a claim of estoppel in its favor on its own wrongful act or dereliction of duty, or for acts or omissions induced by its own conduct.

*Gillespie v. Seymour*, 250 Kan. 123, 129-30, 823 P.2d 782 (1991) (citations omitted).

In support of its position, MTF relies in particular on *Bank of Blue Valley v. Plaza Media*, No. 92,937, 2006 WL 2806613 (Kan. App. Sept. 29, 2006), in particular its observation that a party can be subject to estoppel for a misrepresentation, even it was not known to be false when made, where the circumstances suggest that maker "has a duty to know the facts." 2006 WL 2806613, at *6. In that case, the district court had held that a bank had properly foreclosed on land owned by a husband, and found that its claims were superior to the liens by his former wife, where the wife had executed affidavits prior to the loans indicating that Rodney was current on his support payments.

However, *Bank of Blue Valley* provides little helpful direction here. First, the court's discussion of estoppel was dicta. The district court had found the former wife, Gale, was equitably estopped by having filed the affidavits to support her husband Rodney's loan applications, and Gale did not argue that the reliance element of estoppel was not present until her appeal. The Court of Appeals acknowledged that "arguments not raised in the district court cannot be raised for the first time on appeal and the district court was never given the opportunity to consider the legal requirements of equitable estoppel." *Id*. at. *4 (citing *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003)). However, the court then briefly paused to discuss the issue of estoppel, stating that the elements were present, before proceeding to address what it considered "[t]he more intriguing question in the case," but wholly irrelevant here, the application of the homestead exemption claim to Gale's claim

More importantly, *Bank of Blue Valley* turns on its own unique facts. Specifically, the evidence showed that Rodney had a history of *not* being current in his child support. Then,

apparently at around that time he needed Gale's affidavits to support his loan applications, he gave her a check for $20,000, which bounced after the affidavits were on file. It was in this context that the court ruled that Gale had a duty to ascertain the facts before issuing the affidavits: "in light of the fact that Rodney had not been faithful on his child support and she had just received a check for $20,000, we do not find it unreasonable for her to wait to sign an affidavit to see if there were sufficient funds to cover the check." *Id*. at *6. Further, the Court of Appeals considered the correct priority among the competing lien interests as a balancing of equities, as to which the court specifically agreed with the district court's conclusion that "the Bank did everything in its power to determine whether there were any liens that would cloud its rights in lending money to Rodney. Gale contributed to the Bank's reaching its comfort level by executing affidavits that Rodney was current on his child support obligation." *Id*.

The present case involves none of the elements of family law present in *Bank of Blue Valley*. Nor is there evidence that Lansing was aware of a prior history of fraud or misdealing by Greenfield. And, although MTF can certainly argue that the invoices provision indicating receipt of the goods may have increased its "comfort level" in issuing new credit to Greenfield, it also cannot be said at the present time that MTF "did everything in its power" to ensure there were no problems with the credit extended. Read in the light most favorable to Lansing, a reasonable fact-finder could conclude that there were other actions that MTF could have taken, actions consistent with its standard practices, to ensure that Greenfield's goods were delivered correctly.

The parties dispute the extent to which the defendant may challenge or set-off the invoices based upon Lansing's contractual disputes with Greenfield. MTF argues that Invoices 87036 and 87037 were assigned to it on September 13 and 17, and that accordingly Lansing could not modify when payments might be due through oral agreements reflected in the September 27 e-mail cited by the defendant. Because of the earlier assignment, it argues, Greenfield lost its rights as to the underlying contract pursuant to K.S.A. 84-9-318(a), including the ability to make any changes to its material terms. MTF cites K.S.A. 84-9-406, which provides that, once the account debtor is

notified of the assignment, he "may discharge the account debtor's obligation by paying the assignee and may not discharge the obligation by paying the assignor." With respect to Invoice 87031, MTF argues that Lansing has not alleged that the underlying contract would allow a setoff, and that, because the alleged breach occurred after the date of the invoice, it is not subject to Lansing's breach of contract claim. MTF argues that these oral agreements occurred after the invoices, and so cannot alter the explicit terms in the invoices calling for payment within a given period. Accordingly, it argues that Lansing cannot recover.

In its opposition, Lansing argues that even if MTF is permitted to advance the doctrine of estoppel, it cannot do so successfully under the facts of this case for multiple reasons. It argues that its contract with Greenfield which generated Invoices 80736 and 80737 provided that payment would only be due when the goods were actually delivered, which never occurred. It contends that this agreement existed prior to or contemporaneous to the invoices, though they were later exemplified in writings documenting the understanding. Lansing argues that both of these invoices are void owing to the fraud by Greenfield. Similarly, it contends that MTF cannot recover as to Invoice 87031, as that claim relates to a prior transaction between Greenfield and Lansing, and thus is subject to any offsetting credit which Lansing as account debtor may have. *See Commerce Bank v. Chrysler Realty*, 244 F.3d 777 (10th Cir. 2001).

The court finds that a material question of fact exists as to the nature and terms of the contract between Greenfield and Lansing. There is evidence from which a rational fact-finder could conclude that the e-mail cited by Lansing represents a valid oral modification of the existing contract, including its provision prohibiting oral modifications. Further, the fact-finder could conclude that the e-mail is not a contemporaneous agreement, but simply a memorialization of an oral agreement that occurred prior to the Invoice dates. The court finds that, if Lansing convinces the finder of fact as to the existence of the contract modification, it is entitled to independently recoup or charge against Invoices 87036 and 87037 the amount of its damages.

The amount claimed as a charge or offset as to Invoice 87031, however, arises from a separate transaction (the IREC agreement). Because this reflects a charge relating to a separate transaction between Greenfield and Lansing, under the Uniform Commercial Code (UCC), Lansing may advance this charge under K.S.A. 84-9-404(a)(2) only to the extent the charge "accrue[d] before the account debtor receive[d] notification of the assignment" to MTF.[2] The record is unclear as to the precise time that charge which Lansing seeks to apply to Invoice 87031 actually accrued. To the extent that the evidence shows that the charge accrued after notification of the assignment, Lansing may not advance such charges in opposition to MTF's claim

Lansing argues that such a result would be contrary to the rule expressed in *Commerce Bank*, with its observation that "offsets will be honored when failure to do so would work an injustice" 244 F.3d at 783 (*citing H. Freeman & Son v. Henry's, Inc.*, 239 Kan. 161, 717 P.2d 1049 (1986)). *Commerce Bank*, however, dealt with a charge or offset directly arising relating to the contract between the assignor and the account debtor, and as such was decided under K.S.A. 84-9-318(1)(a) (rights of an assignee are subject to "any defense or claim arising" from the underlying contract), the direct precursor of the current K.S.A. 84-9-404(a)(1).[3] To the extent Lansing is arguing that the generalized "injustice" language of Commerce Bank should be taken as a springboard to ignore the express terms of § 84-9-404(a)(2), permitting such offsets only prior to notice of the assignment, it is seeking to do what it argues MTF cannot do with respect to its equitable estoppel argument —

---

[2]Although Lansing correctly observes that the IREC agreement was referenced in the second, September 11 agreement between Lansing and Greenfield, Lansing has pointed to no contract language showing that the two agreements were somehow integrated into one, single agreement. The court finds that, for purposes of applying K.S.A. 84-9-404, only the September 11 agreement falls within the scope of § 84-9-404(a)(1).

[3]In Commerce Bank, the court held that the assignee financing company was subject to an offset for unpaid rent owing to a car dealer's lessor, an affiliate of Chrysler Corporation. On appeal, the finance company argued that it was subject only to offsets which might be advanced by Chrysler itself, as account debtor. The court, however, found that the Dealer Agreement between the assignor and Chrysler specifically "allows Chrysler Corporation to offset any amount [the dealer] owes to Chrysler Corporation *or its affiliates*." 244 F.3d at 783. The underlying contract between the account debtor and the assignor therefore specifically allowed for such offsets.

vary the express terms of the UCC based upon generalized common law principles of equity and justice.

Turning to that argument, Lansing contends that under the UCC as adopted in Kansas, MTF's rights as an assignee cannot rise any higher than the assignor, Greenfield. K.S.A. 8-9-404. Given this explicit provision, it contends, MTF's equitable estoppel cannot alter the result, because the UCC provides that doctrines such as estoppel may supplement provisions of the UCC, but may not displace them. K.S.A. 8-4-103, cmt. 2.

K.S.A. 8-9-404(a) provides:

**Assignee's rights subject to terms, claims, and defenses; exceptions**. Unless an account debtor has made an enforceable agreement not to assert defenses or claims, ... the rights of an assignee are subject to:

    (1) All terms of the agreement between the account debtor and assignor and any defense or claim in recoupment arising from the transaction that gave rise to the contract; and

    (2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives a notification of the assignment authenticated by the assignor or the assignee.

The question before the court is the extent to which an account debtor's rights under this UCC provision may be modified or altered by the doctrine of equitable estoppel. Generally, the UCC allows common law doctrines to be used in addition to the Code's express terms:

Unless displaced by the particular provisions of the uniform commercial code, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, and other validating or invalidating cause supplement its provisions.

K.S.A. 8-4-103 provides:

The Official Comment to this provision states:

Subsection (b) states the basic relationship of the Uniform Commercial Code to supplemental bodies of law. The Uniform Commercial Code was drafted against the backdrop of existing bodies of law, including the common law and equity, and relies on those bodies of law to supplement its provisions in many important ways. At the same time, the Uniform Commercial Code is the primary source of commercial law rules in areas that it governs, and its rules represent choices made by its drafters and

22

the enacting legislatures about the appropriate policies to be furthered in the transactions it covers. Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.

UCC 1-103 Official Cmt. 2 (emphasis in original).

Kansas courts have not directly addressed the issue of whether equitable estoppel may be used to prevent an account debtor from advancing contract defense claims under claims under § 9-404. *See Decatur Coop Ass'n v. Urban,* 219 Kan. 171, 547 P.2d 323, 329 (1976) (citing statute in context of allowing *promissory* estoppel as means of avoiding the UCC statute of frauds , although noting that "[c]ourts have taken different positions" as to whether equitable estoppel can be advanced as a defense); *Cairo Coop. Exch. v. First Nat'l Bank of Cunningham*, 228 Kan. 613, 620 P.2d 805 (1980) Modified, 229 Kan. 184, 624 P.2d 420 (1981) (McFarland, J. concurring) (majority finding no estoppel on the facts, other than course of conduct, which was not sufficient where bank failed to act with reasonable care under K.S.A. 84-4-406(3), concurrence adding generally that "Kansas has recognized that the law of principal and agent, estoppel, etc., supplements the Code").

As a general matter,  an "assignee .. stands in the shoes of its assignor and obtains only the right, title, and interest ... which the assignor has at the time of the assignment and can acquire no greater rights from the assignment than those possessed by the assignor." *OXY USA, Inc., v. Colorado Interstate Gas*, 20 Kan.App.2d 69, Syl. ¶ 4, 883 P.2d 1216 (1994). More importantly, there is some support for the conclusion that Kansas law would not support the application of equitable estoppel by an assignee, where its assignor has engaged in purposeful or fraudulent misconduct. In *Perry v. Goff Motors*, 12 Kan.App.2d 139, 736 P.2d 949 (1987), a contract for the purchase of a motor vehicle was found to be unenforceable against the buyers, notwithstanding the seller's claim of equitable estoppel. The court held that the assignee "took the contract subject to the plaintiff's claim that the sale was fraudulent and void," and that "validity cannot be given to a void contract through any principle of estoppel." 12 Kan.App.2d at 145, 736 P.2d at 954.

MTF distinguishes *Perry* because that case dealt with a sales contract which was void under state motor vehicles sales law, and not a contract which was simply voidable. Further, because fraudulent inducement typically renders a contract voidable rather than void, *School-Link Technologies v. Applied Resources*, 471 F.Supp.2d 1101, 1118-19 (D. Kan. 2007), the plaintiff argues estoppel is available here, citing the observation in 17A Am.Jur.2d Contacts § 10 (2010) that estoppel "cannot be invoked to render a void agreement valid, but it may be invoked to preclude an attack on an agreement that is merely voidable." [4]

This distinction does not appear to be Kansas law. Perry happened to deal with a contract which was void under state law, and nothing in the case suggests that a different rule applies for voidable contracts. Further, in the early case of *Kansas Elec. Power v. Thomas*, 123 Kan. 321, 255 P. 33, 34 (1927), the court held: "In short, equitable estoppel raises no higher than the law of contract, and is not available in any cases where, under the same circumstances, a contract pertaining to the same matter would be void or voidable."

Finally, MTF relies in particular on *Dimmit & Owens Financial v. Realtek Industr.*, 90 Mich.App. 429, 280 N.W.2d 827 (1979) as expressly rejecting the argument that the UCC displaces estoppel. In particular, in that case the court rejected an argument by an account debtor that the UCC's provision allowing a debtor to invoke defenses available against the assignor did not preclude the debtor from being estopped from such a defense based on statements acknowledging the validity of the debt.

*Dimmit* is not particularly helpful here. In that case, the Michigan Court of Appeals upheld the trial court's finding, following a bench trial on an action by an assignee of accounts receivable,

---

[4]The support for this proposition in the cited authority is a single case, *Gress v. Gress*, 209 S.W.2d 1003, 15 A.L.R.2d 700 (Tex. Civ. App. 1948), in which the court allowed a wife to use estoppel to prevent her husband from annulling a marriage, which was voidable under Texas law based on the timing of the wife's earlier divorce. The decisive fact for the court was the evidence showing that the husband knew of the divorce at the time of the second marriage. The case is thus unhelpful here, not simply because it is from another jurisdiction but because there is no evidence or even suggestion that Lansing actually knew of Greenfield's fraud during the relevant time period.

that the account debtor was equitably estopped from challenging the validity of the debts, based on the debtor's written acknowledgments of the debts. *Dimmitt*, 90 Mich.App. at 433-34, 280 N.W.2d 827. After noting the debtor's argument that the use of estoppel conflicted with the current Michigan version of the UCC, M.C.L. 440.9318(a), the court's response was wholly conclusory: "M.C.L. § 440.1103; M.S.A. § 19.1103 expressly preserves the doctrine of estoppel unless displaced by the particular provisions of the act. We do not find that § 9.318 displaces common law estoppel principles."

The court finds that the application of the common law doctrine of estoppel would effectively revoke the explicit right of an account debtor under K.S.A. 84-9-404 to advance legitimate defenses, including "[a]ll the terms of the agreement between the account debtor and the assignor." This right is circumscribed only by specific subsections of § 84-9-404, none of which is relevant here, and the general exception "[u]nless an account debtor has made an enforceable *agreement* not to assert [such] defenses." K.S.A. 84-9-404(a) (emphasis added).

But equitable estoppel is not grounded on any agreement; it arises in the absence of any agreement through the combined effect of misrepresentation and detrimental reliance. *See Cosgrove v. Young*, 230 Kan. 705, 717, 642 P.2d 75 (1982). *See Toshiba Master Lease, Ltd., v. Ottawa Univ.*, 23 Kan.App.2d 129, 135, 927 P.2d 967, 972 ("Kansas law is very clear — equitable estoppel does not arise out of contract but is based upon concepts of morality and justice"). Permitting the exercise of equitable estoppel, therefore, is at variance with the UCC's explicit language providing that the account debtor may broadly advance defenses to the claim of the assignee, unless he has agreed otherwise.

Accordingly, the court holds that plaintiff may not invoke equitable estoppel to avoid the defenses of non-performance and fraud which have been advanced by Lansing.

Even assuming that equitable estoppel was available as a defense to Lansing's claim as an account debtor under UCC § 404(a), the court finds that MTF would not be entitled to summary

judgment on that issue. Independent questions of material fact would preclude a resolution of the issue of estoppel by other than the ultimate trier-of-fact.

Further, even if the court were to find equitable estoppel available in an action governed by the UCC, questions of material fact preclude any award in favor of plaintiff at the present time. As noted earlier, equitable estoppel is appropriate in cases where the circumstances calling for its application are unambiguous. The type of conduct which is sufficient to give rise to an estoppel generally raises a question of fact unless the facts are stipulated or depend upon the interpretation of unambiguous written documents. *Brown v. Westerhaus*, 224 Kan. 42, 578 P.2d 1102, 1107 (1978).

Further, as the court noted earlier, the right to estoppel must be clear under the circumstances of the case. "Estoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction. A party may not properly base a claim of estoppel in its favor on its own wrongful act or dereliction of duty, or for acts or omissions induced by its own conduct." *Gillespie v. Seymour*, 250 Kan. 123, 129-30, 823 P.2d 782 (1991) (citations omitted).

In the present case, to apply equitable estoppel requires the balancing of the responsibility of both MTF and Lansing. The primary responsibility for the damages to both parties arises apparently from the intentional or capricious misconduct by Greenfield. But there are also substantial questions as to whether either Lansing or MTF contributed to these losses through a want of care. Lansing signed invoices showing the delivery of goods, apparently taking the word of Greenfield that the goods had been properly received at a third party shipping point.

On the other hand, as Lansing points out, there remain questions as to whether MTF failed to use its standard practices of investigating the actions of its assignor, and whether it exercised reasonable care in familiarizing itself with industry practices. Further, while the court (as noted below) does not accept Lansing argument that MTF must show that the signed invoices were the "primary" reason for its decision to extend credit, the plaintiff must still show that it would have acted otherwise in the absence of the Lansing's invoice signatures. In the present case this may well

turn on issues of credibility, and the court finds that a rational fact finder could conclude that no reliance has been demonstrated.

In conclusion, the court notes two contentions by Lansing, in the course of its argument that no estoppel is here presented on the facts, which appear to be incorrect statements of Kansas law, and accordingly which would not form the basis for any resolution of the issue of estoppel. First, it argues that estoppel is inappropriate, because the evidence fails to show that MTF relied "primarily" on its signature on the invoices, as opposed to other factors (such as the presence of insurance). Second, it argues that it engaged in no deliberate deception when it completed the invoices, being under the mistaken impression that the goods actually had been delivered. Lansing cites *St. Francis Reg'l Med. Ctr. v. Critical Care*, 997 F.Supp. 1413, 1427-28 (D. Kan. 1997) in support of the former proposition, but the idea that a party may not claim an estoppel unless the misrepresentation played a "primary" role in its decision-making process does not appear in the case. Instead, courts generally hold that an estoppel may arise if the representation played a causal role in the detrimental reliance. *See City of Olathe v. Scott*, 253 Kan. 687, 861 P.2d 1287, 1297 (1993) (citing *Turon State Bank v. Bozarth*, 235 Kan. 786, 790, 684 P.2d 419 (1984) and holding that party entitled to estoppel if representation causes it "act as it would not otherwise act.")

In support of the latter argument, Lansing, which is otherwise critical of MTF's reliance on the encyclopedic treatise, cites to the observation in 28 Am.Jur.2d, Estoppel & Waiver, § 47 (2010) that "estoppel requires deliberate deception." (Dkt. 83, at 37). But Kansas law is to the contrary. To "invoke the doctrine of equitable estoppel, a party need not have 'planned or contrived with the deliberate intent to lull [the opposing party] into a false sense of security'" *See Ferrell v. Ferrell*, 11 Kan.App.2d 228, 235, 719 P.2d 1, 6 (1986) (quoting *Coffey v. Stephens*, 3 Kan.App.2d 596, 600, 599 P.2d 310 (1979). In *Rex v. Warner*, 183 Kan. 763, 774, 332 P.2d 572, 581 (1959), on the issue of equitable estoppel as a bar to a statute of limitations defense, the court approvingly quoted another provision of the treatise in question, 34 Am.Jur., Limitation of Actions, § 411, at 324:

> While the cases in which an estoppel to defend upon the ground of the statute of limitations are confined generally to instances in which an element of deception is

involved, *actual fraud in the technical sense, bad faith, or an intent to mislead or deceive is not essential to create such an estoppel*. It is sufficient for this purpose that the debtor made misrepresentations which misled the creditor, who acted upon them in good faith, to the extent that he failed to commence action within the statutory period.

*See also American Indem. v. Peak*, 126 Kan. 606, 274 P. 227 (1929) ("that an estoppel must possess an element of fraud, does not mean that there should be an actual fraudulent intent or design to deceive on the part of the party sought to be estopped, but only that the case should be one in which the circumstances and conduct would render it a fraud for the party to deny what he had previously induced or suffered another to believe and take action upon") (quoting 21 C.J. 1122).

Accordingly, the court finds that the defendant as an account debtor may advance all relevant defenses and set-offs as to the charges imposed in Invoices 87036 and 87037. It may assert such defenses or set-offs as to the charge in Invoice 87031 only if the claims arose prior to its notification of the assignment to MTF. Triable issues of material fact exist with respect to the timing and content of the oral modifications to the contractual relations between Lansing and Greenfield. The plaintiff's motion as to issue of equitable estoppel is denied, as the court finds such a claim is precluded by operation of the U.C.C., and in any event the uncontroverted evidence fails to demonstrate beyond a reasonable doubt the unambiguous existence of the elements of estoppel.

IT IS ACCORDINGLY ORDERED this 21st day of March, 2011, that the plaintiff's Motion for Summary Judgment (Dkt. 47) is denied, that of the defendant (Dkt. 82) is granted in part and denied in part, as provided herein. The defendant's Motion for Default Judgment (Dkt. 81) is granted.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE